# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## FEBRUARY 1997 SESSION



**FILED**

**July 25, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **C.C.A. NO. 02C01-9605-CR-00170** |
| Appellee, | ) | |
| | ) | **SHELBY COUNTY** |
| VS. | ) | |
| | ) | **HON. JOSEPH B. BROWN, JR.,** |
| **KEVIN B. BURNS,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First-degree murder death penalty; |
| | ) | attempted felony murder) |

FOR THE APPELLANT:           FOR THE APPELLEE:


**GLENN I. WRIGHT**
200 Jefferson Ave.
Suite 800
Memphis, TN   38103

**WILLIAM L. JOHNSON**
50 N. Front St.
Suite 1150
Memphis, TN   38103

**JOHN KNOX WALKUP**
Attorney General & Reporter

**DARIAN B. TAYLOR**
Asst. Attorney General
450 James Robertson Pkwy.
Nashville, TN  37243-0493

**JOHN W. PIEROTTI**
District Attorney General

**THOMAS D. HENDERSON**
-and-
**JOHN WHEELER CAMPBELL**
Asst. District Attorneys General
201 Poplar Ave.
Memphis, TN   38103


OPINION FILED:_____


**CONVICTIONS FOR FIRST-DEGREE MURDER AND DEATH PENALTY AFFIRMED; CONVICTIONS FOR ATTEMPTED FELONY MURDER REVERSED AND REMANDED**

**JOHN H. PEAY,**
Judge

**O P I N I O N**

The defendant was indicted on two counts of murder in the perpetration of a robbery (felony murder), two counts of premeditated murder, two counts of attempted first-degree murder during the perpetration of a robbery (attempted felony murder) and two counts of attempted premeditated first-degree murder. A jury convicted him of two counts of felony murder and two counts of attempted felony murder. After a hearing, the jury sentenced the defendant to death for one of the murders and to life imprisonment for the other murder. He was sentenced to twenty-five years for each of the attempted felony murders. In this appeal as of right, he raises the following issues:

I.    The sufficiency of the convicting evidence;

II.    The trial court's refusal to suppress his statement;

III.    The trial court's instruction to the jury on flight;

IV.    The validity of his convictions for attempted felony murder;

V.    The trial court's failure to grant a mistrial upon sobbing in the courtroom;

VI.    The admissibility of a crime scene photograph;

VII.    The trial court's responses to questions from the jury during its deliberations;

VIII.    The sufficiency of the evidence in support of the death penalty;

IX.    Whether the death penalty was properly imposed in light of the defendant's role in the crime;

X.    Whether the victims' mothers were properly permitted to testify during the sentencing hearing as to the impact of the murders; and

XI.    The constitutionality of Tennessee's death penalty statutes.

Following our review of the record in this matter, we affirm the defendant's first-degree murder convictions and sentences, reverse and dismiss his convictions for attempted felony murder, and remand this matter for retrial of two counts of attempted premeditated

2

first-degree murder.

**FACTS**

The proof at trial established that on April 20, 1992, at approximately 3:15 in the afternoon, Eric Thomas, Damond Dawson, Tommie Blackman and Tracey Johnson gathered at Dawson's house in a residential neighborhood in East Memphis. The four men ranged in age from sixteen to twenty-one years old. They sat in Dawson's sedan while it was parked in his driveway, the front of the car facing and perpendicular to the street. Dawson sat in the driver's seat, Johnson in the front passenger seat, Thomas behind Dawson in the back seat and Blackman in the back seat behind Johnson. While they sat there, they smoked some marijuana and drank some gin. Johnson's mother testified that she had seen her son wearing a jewelry chain that morning.

Thomas testified that, five or ten minutes after they had been in the car, Carlito Adams and another male walked up to its passenger side. The other male pulled out a pistol. Carlito Adams exchanged some words with Blackman and told him to get out of the car. Blackman initially refused, then got out of the car and began running. Thomas testified that Carlito Adams had then said, "Get him." At that point, according to Thomas, three or four more men "came from around the bushes and shot at [Blackman] about six or seven times." On cross-examination, however, Thomas stated that he had seen only one person actually fire at Blackman as he ran away.

Thomas testified that he, Dawson and Johnson had remained in the car while the men then surrounded it, pointed pistols at them and robbed them, taking money from him and jewelry from Johnson and Dawson. After taking these items, according to Thomas, the men had begun shooting at them, hitting him in the chest and stomach. Thomas testified that they had also been shooting Dawson and Johnson and he had decided to "lay down and try to play dead." At some point, he testified, "they ran off, and

3

I thought that was it. And then I heard some footsteps coming back, so I laid back there again, and somebody came back and started shooting back again." On this return visit, Thomas testified, two people had shot on his side of the car, hitting him in the upper leg and shooting Dawson again. Someone said, "We got 'em," and the assailants then left. When Thomas rose from his position, he saw Dawson "messed up pretty bad in the front seat." When he looked across the street, he saw Johnson "lying with his head on the sidewalk and his body -- the rest of his body in the street."

Thomas testified that Carlito Adams had been the only assailant he had recognized. However, on April 22, 1992, detectives showed him a photographic spread from which he identified number five as the person who had shot him.[1] He also testified that this same person had taken his money and shot someone else. Thomas testified that none of the occupants of the car had had any guns or knives.

On cross-examination, Thomas admitted to having initially told the police that Carlito Adams had shot him. He explained that he had given the police Adams' name when they arrived on the scene and while he was still in the car after having been shot. He testified that Adams had been "the only person I knew on the scene, and I thought I was gonna die. And the only way I was going to get them to come to justice was to call out the only name that I knew at that time, which was Carlito Adams."

Tommie Blackman also testified at trial. He stated that, while he and his three friends had sat in Dawson's car, Carlito Adams and another man came up to the passenger side of the car. Adams asked him to get out, Dawson told him not to, and the other male pulled a pistol and went to the driver's side of the car. When the other male passed in front of the car going to the driver's side, Blackman pushed the door open,

---

[1] Thomas did not make an in-court identification of the defendant. And while no proof was introduced as to the name of the person whose photograph was identified as "number five," an FBI agent testified that the photograph appeared to be of the defendant.

4

hitting Adams and knocking him down. Blackman then got out of the car and ran behind it toward the house. He heard Adams yell and turned to see two or three other men coming from behind the bushes beside the driveway pointing pistols and shooting. Blackman continued to run to the house, eventually making it inside. He testified that he had continued to hear shooting after he was in the house. He received a minor bullet wound to his right arm as he ran. Blackman also testified that he had recently gotten into an argument with Adams while they were playing basketball.

Eric Dewayne Jones was fourteen in April 1992 and lived across the street from Dawson. On the day of the murders, he was playing basketball in Dawson's yard with a couple of other boys. He testified that, as he had been on his way back home and approaching the front of Dawson's house, he saw some men holding a gun on Dawson, Blackman, Johnson and Thomas as they sat in Dawson's car. He testified that he had seen "about three of them," recognizing only Carlito Adams. He testified that he had "stopped in my tracks, and [Blackman] was running my way." As Blackman approached him, Jones testified, he told him to run. Jones did so, preceding Blackman as they ran toward the house. He testified that, as they had run, someone had shot at them "several times." He further testified that, while he and Blackman had been running, the boys with whom he had been playing basketball were also several feet away, in the line of fire.

After he had reached the house, Jones testified, he heard seven or eight more shots. He also testified that, about two seconds before Blackman came running at him, he had heard the man standing at Dawson's door with a pistol say "Drop it off" and that the men inside the car had been "cooperating, taking off the jewelry and money out [of] their pockets."

Mary Jones, Eric Jones' mother, lived in the house directly across the street from Dawson's. She testified that, on the afternoon of April 20, 1992, she had

5

heard a gunshot and went to look out her door to see what was happening. As she looked out, she saw two men running up Dawson's driveway toward the car in which Dawson and the others were sitting. She testified that these two men had had their guns "down" as they were running. However, "as they approached the car, the one on the driver's side, he walked up to the car and started shooting." She testified that she had also seen another man run up to the passenger side of the car "with a gun in his hand. And he shot [Johnson] once in the chest. And the other guy that was on the driver's side, he was shooting [Dawson] several times. And after he stopped for awhile, he walked around in front of the car with the gun pointed, and he slowly walked on back around on the driver's side again and started shooting some more." She testified that Dawson's car had been "directly facing my driveway and door" and that she could see who was sitting in the car.

On cross-examination, Ms. Jones admitted that she had been unable to identify the shooters from a photo spread shortly after the shooting. However, she explained this as a result of the photos being out of date. On redirect, she stated unequivocally that she recognized the defendant as "the one that shot [Dawson]," and that he had been the person who had shot, gone to the front of the car, returned and shot again. She further stated on recross that she had gotten "a real good look in his face" as he ran toward her after the shooting.

Kenneth Alan Shackelford, a Memphis police officer, testified that he had arrived on the crime scene so soon after the shooting that he "could still smell gunpowder in the air from the guns going off." He found Johnson lying face down at the sidewalk, already dead. He checked the car, found Dawson and Thomas still alive, and called ambulances. He testified that he had checked the car and found no weapons in it. Officer Frederick Louis Sansom also testified that he had found no weapons in the car, but had found numerous cartridge casings in and near the car and one bullet in the car.

6

He further testified that he had observed Johnson's body and that he had seen no watch or jewelry on it. No weapons were found at the crime scene.

FBI agent Scott M. Bakken testified that, in June 1992, his office in Chicago had received a request from the Memphis FBI office to locate and apprehend the defendant. Subsequent to that request, he and several other agents located the defendant at the apartment building where the defendant's brother and sister lived and took him into custody. He testified that the defendant had cooperated and presented no problem. When the defendant was delivered to the FBI office in Chicago, he was turned over to agents John Landman and Lee W. Harbaugh.

Agent Lee W. Harbaugh testified that the defendant had been advised of his rights in his presence and that the defendant had signed a waiver of those rights. Agent Harbaugh also signed the waiver as a witness. He testified that the defendant had been very cooperative and that, after signing the waiver of rights form, the defendant gave him a statement about the shooting. According to agent Harbaugh's testimony, the defendant's account of the events was as follows:

> The defendant had been living in West Memphis when he received a phone call from Kevin Shaw telling him that four men had jumped Shaw's cousin in East Memphis, Tennessee. The defendant and another man went to Shaw's residence where they met Shaw and two other men. Shaw explained that the five of them were going to go fight the men who had jumped his cousin. The five men then left in two cars and drove to a residential area in East Memphis. When they got out of the cars, Shaw and two of the other men pulled out handguns. Shaw had two extra handguns which he gave to the defendant and the fifth man. The defendant asked Shaw what the guns were for and was told that the four men they were going to fight would be armed. The five men then began to walk toward Dawson's car. A short distance from the car, the defendant and two of the men stopped while Shaw and the fifth man continued toward the car. Shaw appeared to be conversing with one of the men in the car. The defendant then heard a gunshot, one of the men got out of the car and began running, and Shaw and the other man at the car began shooting at the man running away. Right after that, the defendant stepped toward the driveway and, from about ten to twenty feet, fired the handgun he had been given at the man running away. The defendant fired at this man three times as he ran across the yard.

> Then there was a lot of shooting. He then ran back to the cars in which they had arrived. The rest of the men ran back as well, and they all left the scene in their cars. When the defendant later learned that there had been a shooting in East Memphis, he thought it might have been the one in which he had been involved. He then got a friend of his to give him a ride to Chicago where his brother and sister lived.[2]

Agent Harbaugh further testified that the photograph identified by Eric Thomas from the photo spread appeared to be of the defendant.

Dr. O'Brian Cleary Smith performed the autopsies on Johnson and Dawson. He testified that Johnson had been shot once in the chest with the bullet going through the heart and into the left lung. He testified that, with this type of wound, a person could live some minutes, maintain consciousness and be capable of moving for some amount of time. He testified that this gunshot wound had caused Johnson's death. Dr. Smith testified that Dawson had received five gunshot wounds: one to the left upper arm, one in the left chest, two on the side of the left buttock and one on the left hip. He further testified that Dawson had died "as a result of multiple gunshot wounds."

The defendant offered no proof.

---

[2]This is not a verbatim account of Agent Harbaugh's trial testimony. It is indented in this opinion solely as a matter of reading convenience.

**ANALYSIS**

**I. SUFFICIENCY OF THE EVIDENCE**

The defendant first challenges the sufficiency of the evidence on which his murder convictions are based. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

These murders were committed on April 20, 1992. At that time, the form of first-degree murder known as "felony murder" consisted of "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." T.C.A. § 39-13-202(a)(2) (1991 Repl). In this case, the murders were committed in the perpetration of a robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (1991 Repl). Furthermore, a person is criminally responsible for the conduct of another when the person, "[a]cting with intent to promote or assist the commission of the offense, or to

9

benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2) (1991 Repl).

In his statement to agent Harbaugh, the defendant indicated that he had accompanied Shaw and three other men to the scene of the crime and that their intent had been to confront the people who had "jumped" Shaw's cousin. Once they arrived in the general proximity, Shaw gave the defendant a handgun. Nothing in the record demonstrates that the defendant refused the weapon or was forced to carry it. The defendant further indicated in his statement that he had willingly walked toward Dawson's car and that he subsequently shot three times in the direction of the fleeing occupant. Thus, since there appears to be no doubt that the defendant was present at the scene of the crime, the pivotal question becomes whether the proof was sufficient to support a finding that he killed Dawson and Johnson in the perpetration of a robbery and/or that he was criminally responsible for the conduct of another in this respect.

The record establishes that Johnson, Dawson and Thomas were robbed as they sat in Dawson's car, and that they were all shot as soon as the robbery was complete. Thomas testified that Carlito Adams and several other individuals had surrounded the car, "[p]ulled out their pistols, had their pistols aimed at us. Took money from me; took jewelry from [Johnson]; took jewelry from [Dawson]." Upon being asked what happened next, he testified, "they opened fire, and they started shooting us." Shortly after the shootings, Thomas identified one of the assailants from a photo spread. He testified at trial that this had been the man who had taken his property and then shot him. Although Thomas did not make an in-court identification of the defendant, this photo spread was provided to the jury members and they were able to determine with their own eyes whether or not the photo was of the defendant. Moreover, agent Harbaugh testified that the photo appeared to be of the defendant. Thus, the jury could properly have concluded from Thomas' testimony alone that the defendant participated in the robbery

10

and shot at the car's occupants. However, the jury also had before it Mary Jones' testimony that she had seen the defendant shoot Dawson, that she had been "looking right at him" and that "[a]s [the defendant] was running down the driveway, after he finished shooting [Dawson], that's when I got a real good look in his face." And Eric Jones' testimony corroborated Thomas' testimony that Thomas, Johnson and Dawson had all been robbed and then fired upon. Johnson's mother testified that she had seen her son wearing a jewelry chain the morning of his murder. When he was found by the police, immediately after the shooting occurred, there was no jewelry.

Taken in the light most favorable to the State, this proof was more than sufficient to establish beyond a reasonable doubt that the defendant had participated in a robbery of Thomas, Johnson and Dawson and that, immediately following the robbery, he shot and killed Dawson. And although there was no direct proof that the defendant shot at and killed Johnson, the evidence established that Johnson had been shot while in the car following the robbery in which the defendant participated. Thus, although one or more of the other men surrounding the car and robbing its occupants may have actually fired the bullet that killed Johnson, the defendant remains responsible for Johnson's murder:

> The Tennessee offense [of felony murder during the perpetration of a robbery] extends both to the killer and his accomplices. A defendant who is a willing and active participant in a robbery becomes accountable for all of the consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer.

State v. Middlebrooks, 840 S.W.2d 317, 336 (Tenn. 1992).

The felony murder statute dealt with in Middlebrooks was slightly different from the one at issue in this case, providing, "Every murder . . . committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing

or discharging of a destructive device or bomb, is murder in the first degree." T.C.A. § 39-2-202(a) (1982). In 1989, the statute was amended to provide that the killing in the perpetration of the enumerated felonies be "reckless." T.C.A. § 39-13-202(a)(2) (1989 Supp). "Reckless" in turn refers to a person who, although aware of a substantial and unjustifiable risk that a person or persons will be killed as a result of his conduct, nevertheless consciously disregards that risk and engages in the conduct. See T.C.A. § 39-11-106(31) (1991 Repl). This Court has previously held that this addition of the word "reckless" to the felony murder statute "does not alter the principle that an accomplice to the underlying felony may also be guilty of felony murder even though the killing has been committed by a co-felon. The jury need only find that the defendant was a participant in the perpetration of the underlying felony and that his conduct as to the killing was ⟨reckless.'" State v. Timothy D. Harris, C.C.A. No. 02C01-9211-CR-00258, Shelby County (Tenn. Crim. App. filed April 13, 1994, at Jackson), rev'd on other grounds (1996). And, as our Supreme Court noted in Middlebrooks, "one who purposely undertakes a felony that results in a death, almost always can be found reckless." 840 S.W.2d at 345.

In this case, the strongest legitimate view of the proof in favor of the State is that the defendant approached Dawson's car with a loaded pistol, participated in a robbery in which other armed individuals were also participating, and then shot several times into the car. The defendant's actions satisfy the statutory definition of "reckless." Accordingly, the proof at trial was sufficient to prove beyond a reasonable doubt that the defendant murdered Dawson in the perpetration of a robbery, and that he was criminally responsible for Johnson's murder in the perpetration of the same robbery. Both convictions are supported by the evidence and this issue is therefore without merit.

## II. SUPPRESSION OF DEFENDANT'S STATEMENT

The defendant next complains that the trial court erred when it denied his

12

motion to suppress his statement. The defendant was apprehended in Chicago by FBI agents. He testified at the suppression hearing that he had been read his rights when he was first arrested and handcuffed. He also testified that he had understood his rights before making his statement, that he had not been promised anything in return for his statement, and that he had not been threatened into making his statement. However, when asked at the suppression hearing, "you knew you didn't have to talk to [the agent]?", the defendant responded, "I didn't really understand, but I did because he was asking me questions." This is the crux of the defendant's contention that he did not waive his constitutional rights freely and voluntarily.

It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pre-trial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). Moreover, the trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the appellant can show that the evidence preponderates against the trial court's ruling. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). In the instant case, the defendant has failed to demonstrate how the evidence preponderates against the trial court's ruling.

At the conclusion of the testimony at the suppression hearing, the trial court stated the following:

> The defendant says the person that handcuffed him gave him his rights on the scene -- he didn't read them from a card, but he said them to him. He said he understood his rights. He doesn't remember all of them, but he knows that he was advised, ‹You have a right to remain silent and anything you say can and will be used against you.'
>
> He doesn't recall the one about right to counsel, as is complained of in the motion; but he, too, does not deny that he was not [sic] told this. He admits, freely, that he was advised of his rights when he was initially handcuffed. Through his own statement, he was advised of his rights; he understood them; he's a high-school graduate; he was not coerced; he was not pressured; he was not threatened; nobody promised him anything.

. . . .

> But from what the court has . . . seen here, it would appear that, on all fours, the defendant freely and voluntarily, understandingly, knowingly, advisedly, and intelligently waived his rights free from any coercion, threats, pressures of any kind that would have induced him or caused him to have abandoned his rights.
>
> He claims he understood them, and from his testimony, the court would have to find that even if his recall is more accurate than that of Agent Landman, through his own evidence, the statement that is purportedly given by the defendant to Agent Landman would be admissible into evidence. The motion to suppress, respectfully, will be denied.

This ruling by the trial court was proper. Although he claims in his brief that he "did not understand his rights," the defendant admitted during the suppression hearing that he had understood the waiver form and that he had freely and voluntarily talked to the agents. There is nothing before this Court which preponderates against the trial court's findings. Accordingly, this issue is without merit.

## III. INSTRUCTION ON FLIGHT

In his next issue, the defendant contends that the trial court erred when it instructed the jury on flight. He further contends that this error was not harmless because of the "heavy emphasis" the prosecutor placed on it during closing argument. We disagree and find this issue to be without merit.

Agent Harbaugh testified that, in his statement, the defendant had admitted to leaving the crime scene immediately after the shootings. Later, he heard something about a shooting in East Memphis and thought it might be the one in which he had been involved. He then left his residence and went to Chicago where he remained until he was apprehended by the FBI in June 1992. He now contends that a jury instruction on flight was not warranted because he "never committed any act of hiding out, evasion or concealment of his person in the community."

14

The defendant misapprehends the circumstances necessary to justify a jury instruction on flight. This Court has previously recognized that there is evidence sufficient to support a jury instruction on flight where there is proof of " 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.' " State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (citations omitted) (emphasis added). And the trial court in this case charged the jury accordingly, stating, inter alia,

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction; however, it takes both the leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

(emphasis added). Here, the defendant both ran from the crime scene and subsequently left his home in West Memphis for Chicago. Such evidence supported a jury instruction on flight, and the trial court did not err in so instructing the jury. This issue is without merit.[3]

## IV. ATTEMPTED FELONY MURDER

In addition to being convicted of two counts of felony murder, the defendant was convicted of two counts of attempted felony murder. The State correctly concedes that attempted felony murder does not constitute a crime in Tennessee. State v. Kimbrough, 924 S.W.2d 888, 892 (Tenn. 1996). Accordingly, we reverse and dismiss those two convictions. However, we are left with the issue of whether the defendant may now be retried on the charges of attempted premeditated murder. The precise issue is whether a defendant may be retried under an alternative count on which the jury made no finding where the count of which the defendant was convicted fails to state an offense. We find this issue to be a matter of first impression in Tennessee.

---

[3] Our ruling that the trial court's instruction to the jury on flight was not error renders moot the defendant's contention that the "error" was not harmless.

A defendant may be retried for an offense when his conviction is set aside because of an error in the proceedings rather than because the State failed in its effort to prove him guilty. Burks v. United States, 437 U.S. 1 (1978); State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990). For instance, retrial is appropriate where the conviction is reversed due to the "incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct." Burks v. United States, 437 U.S. 1, 15 (1978). Similarly, a defendant may be reindicted and tried on other offenses where his conviction is reversed because the underlying statute is later deemed unconstitutional. State v. Hale, 840 S.W.2d 307, 308 (Tenn. 1992). In the instant case, the defendant's convictions for attempted felony murder are being reversed because our Supreme Court has ruled that no such offense exists. That is, due to a fundamental error in the proceedings, the defendant was tried for a crime which is impossible to commit. Obviously, he cannot be retried for attempted felony murder. We must determine, then, whether he can be retried for attempted premeditated first-degree murder. We hold that Burns has been neither convicted nor acquitted of these crimes and principles of double jeopardy do not therefore prohibit his retrial.

Burns was indicted for both attempted felony murder and attempted premeditated first-degree murder, and both counts were sent to the jury. However, the trial court instructed the jury in this case to first consider Count 1 of the indictments which charged the offense of attempted felony murder. The jury was instructed that if they found the defendant guilty of attempted felony murder, they would so report. The jury was further instructed that if they found the defendant not guilty of that offense, they would then proceed to inquire as to his guilt of attempted premeditated first-degree murder as charged in Count 2 of the indictments. In other words, the jury was not to consider attempted premeditated first-degree murder if they found the defendant guilty of attempted felony murder.

16

Typically, when a jury is given a multi-count charge and returns a special verdict convicting the defendant of one of the charges but which is silent as to the other charges, the defendant is deemed acquitted of the other charges. See, e.g., Conner v. State, 531 S.W.2d 119,126 (Tenn. Crim. App. 1975). The State is then prohibited from retrying the defendant on the acquitted charges even if the conviction is later reversed. Id. As this Court held in State v. Arnold, however, "we are of the opinion that this rule is not applicable to the situation involved in the present case." 637 S.W.2d 891, 895 (Tenn. Crim. App. 1982).

In Arnold, each of the defendants had been charged with a conspiracy to engage in the protracted and repeated sales of controlled substances, with being a habitual drug offender, and with specific drug transactions as separate and additional offenses. The controlling statute (and the jury instructions) limited the jury to finding the defendants guilty of either being habitual drug offenders or of committing the specific drug deals, but not both. The jury found each of the defendants guilty of being a habitual drug offender. On appeal, this Court found the evidence to have been insufficient to support the habitual drug offender convictions. Nevertheless, the case was remanded for a new trial on the specific drug transactions.

In so holding, this Court acknowledged the general rule that "a special verdict upon one count of an indictment operates as an acquittal upon the other counts to which the jury did not respond." Arnold, 637 S.W.2d at 895. In distinguishing the case before it, this Court reasoned that

> [i]mplicit in the jury's verdict finding the appellants guilty under the first count of being habitual drug offenders is a finding of their guilt of the transactions separately charged in the fourth and fifth counts; yet, because of the restrictions in the statute, the jury, once it found the appellants guilty under the first count, was precluded from reporting a verdict of guilt on the separate offenses charged in the fourth and fifth counts.

17

> Therefore, we conclude that because of the restrictive language contained in the habitual drug offender statute, the jury's failure to report a verdict on the fourth and fifth counts did not operate as a verdict of acquittal on those charges, and a remand for trial on those counts would be in order.

Arnold, 637 S.W.2d at 895. Although we are not dealing with a statutory restriction in the case sub judice, we find the trial court's instructions to the jury to have operated to the same effect. Once the jury found Burns guilty of attempted felony murder, its instructions were to move on and make no report on the charges of attempted premeditated murder and its lesser offenses. Yet, implicit in the convictions for attempted felony murder was a finding that the defendant had indeed attempted to kill two people. While we cannot know whether the jury would have convicted the defendant of attempted premeditated murder or one of its lesser offenses had it been given the opportunity to consider those charges, the evidence was certainly sufficient for it to have done so.

The United States Supreme Court has also spoken on implied acquittals, finding them to bar retrial under the federal Double Jeopardy Clause[4] when the jury has been given "a full opportunity to return a verdict" on a charge and instead found the defendant guilty of a lesser charge. Price v. Georgia, 398 U.S. 323, 329 (1970)(footnote omitted). See also Green v. United States, 355 U.S. 184 (1957). That is, "[o]nly where the jury is given the full opportunity to return a verdict either on the greater or, alternatively, on the lesser included offense does the doctrine of implied acquittal obtain." United States v. Reed, 617 F.Supp. 792, 800 (D.C.Md. 1985) (emphasis in original). While we realize that attempted premeditated murder is not a lesser offense of attempted felony murder, we are convinced that the same analysis is appropriate. See Schiro v. Farley, 510 U.S. 222, __, 114 S.Ct. 783, 792 (1994) ("The failure to return a verdict does not have collateral estoppel effect . . . unless the record establishes that the issue was actually and necessarily decided in the defendant's favor.") Here, the jury was not given the full opportunity to return a verdict either on attempted felony murder or, alternatively,

_____

[4]U.S. Const. amend. V.

18

on attempted premeditated murder and its lesser offenses.  Because the jury was not given that opportunity, its verdict did not necessarily resolve in Burns' favor the issue of his guilt of the alternative crimes and the doctrine of implied acquittal should not apply.[5]

Finally, our Supreme Court has made it clear that a defendant may be retried for lesser offenses following reversal of his or her conviction for the greater offense.  State v. Maupin, 859 S.W.2d 313, 317 (Tenn. 1993).  In Maupin, the defendant had been charged in a single count indictment with aiding and abetting first-degree murder of a child resulting from repeated child abuse.  The jury was charged with the indicted offense as well as with the lesser offenses of aiding and abetting second-degree murder, aiding and abetting aggravated child abuse and aiding and abetting child abuse. nThe jury convicted the defendant of the aiding and abetting first-degree murder charge. However, the statute creating that grade of first-degree murder, T.C.A. § 39-2-202(a)(2)(Supp. 1988), was later found unconstitutional.  State v. Hale, 840 S.W.2d 307 (Tenn. 1992).  Accordingly, our Supreme Court reversed Maupin's conviction but ruled that she could be retried on the lesser offenses.  In so holding, the Court stated:

> Maupin was not acquitted of any of the lesser offenses as the jury was not required to pass judgment upon them.
> . . .

---

[5]Cf. Saylor v. Cornelius, 845 F.2d 1401 (6th Cir. 1988).  In Saylor, the defendant had been indicted on one count of murder, which count encompassed murder as a principal, as an accomplice, and by conspiracy.  The trial court instructed the jury only on the theory of the defendant's involvement as a conspirator.  The prosecution did not object to the instructions nor request a charge on accomplice liability.  The jury convicted the defendant and the conviction was later reversed for insufficient evidence. Although there was "considerable evidence" supporting the defendant's role as an accomplice, the 6th Circuit Court of Appeals held that double jeopardy principles barred retrial on that ground.  The Court stated, "Once the jury returned its verdict, the failure to instruct on the accomplice liability theory terminated Saylor's jeopardy . . . .  To deny this proposition would mean that the prosecution could proceed on several theories of liability throughout a trial, and, simply by withholding instructions on any one of them, reserve that theory for retrial at a later date."  845 F.2d at 1404.  The Court later limited its holding in Saylor, stating that its significance was "limited by the unusual situation we were addressing in that case:  because of prosecutorial absent-mindedness, Mr. Saylor's trial ended without an acquittal or a conviction on a charge that had been properly presented in an indictment and emphasized at trial." U.S. v. Davis, 873 F.2d 900, 906 (6th Cir. 1989).  This case is clearly distinguishable from Saylor, although both cases involve unfortunate jury instructions.  In Saylor, the trial court's action was the functional equivalent of a dismissal of the accomplice theory, in which the prosecution acquiesced.  The defendant, on the other hand, had objected to proceeding on the conspiracy theory.  In the present case, the trial court did submit the alternative count to the jury but, in effect, relieved it of its duty to consider that count upon its finding Burns guilty of attempted felony murder.  The prosecution was in no way trying to "reserve a theory" for later use in the event the jury acquitted the defendant of attempted felony murder.

> [D]ouble jeopardy should not bar a retrial when the trier of fact does not pass upon lesser offenses one way or the other. There having been no factual resolution of Maupin's guilt or innocence on the lesser offenses, she can be tried for those offenses without violating double jeopardy.
>
> . . .
>
> We find no double jeopardy impediment in allowing Maupin, like Hale, to be tried for lesser offenses simply because she was convicted of the greater offense under a flawed statute.

859 S.W.2d at 318-19.

Similarly, in the case at bar, the jury was not required to pass on the alternative counts of attempted premeditated murder and its lesser offenses and there has therefore been no factual resolution of the defendant's guilt or innocence of those crimes. Indeed, the only factual resolution made by the jury on the attempted murder counts was that the defendant <u>did</u> attempt to murder two people. Analogously to Maupin, the defendant in this case was convicted of an offense under a flawed legal interpretation of the attempt and felony murder statutes. The jury was not given an opportunity to convict Burns of the cognizable crimes of attempted premeditated murder or its lesser offenses. Double jeopardy should not, therefore, bar his retrial for these offenses. Accordingly we hold that this matter is to be remanded for the defendant to be retried on two counts of attempted premeditated murder.

## V. SPECTATOR DISPLAY

The defendant also contends that he should be given a new trial because of an "outburst" by members of the victims' families during testimony. He argues that this "outburst" was "prejudicial and designed to gain the jurors' sympathy." However, upon his lawyer's objection, the trial court found as follows:

> What you have here is two individuals involved -- the mothers of the deceased two individuals. It was not a great outburst. It was something the court would characterize more as a sob, and that was closely contiguous with testimony that the deceased, [Johnson], somehow got out of the car; he stopped to see if traffic was coming -- car was coming; he got across the street; he was holding his hands out. The witness demonstrated saying "Help me, help me," then he stumbled and fell. At that point, I believe one of the ladies, who was a parent of that deceased, and one other who was the parent of the other deceased, got up and left the courtroom. They didn't slam the door or anything like that. I wouldn't say there was a great hubbub or anything like that. One of them sobbed. I would not say it was a particularly loud one. It was noticeable, but that's about it.
>
> . . . .
>
> I don't think it's unexpected by any of the jurors that someone would not have some emotional reaction to a description of their child.
>
> . . .
>
> Under the circumstances, as they exist right now, the court does not think it's something that's going on, on an on-going basis. It does not appear to be any calculated display of histrionics or anything like that for the purpose of influencing the jury or soliciting or eliciting their passions.
>
> . . . .
>
> It was not anything that was done overtly. It was a sob, and the parties immediately removed themselves without undue display when their emotions got out of control. Now, I don't believe there are going to be any other witnesses that would testify to being eyewitnesses to these events. So, I don't think the problem is going to rise again.
>
> . . .
>
> I don't think that the behavior exhibited by the two ladies in question is outrageous or anything like that or particularly offensive. I don't think it's likely to happen again, so I don't think we will have any further problem. But in any event, looking at the jury's reaction -- I always do that -- it did not appear that they were unduly disturbed by the thing.

We first note that defense counsel did not move for a mistrial at the time this incident occurred. Rather, he objected and requested that the mothers remove themselves from the courtroom if the testimony was "going to be too painful for them to sit [there] without an outburst." Defendant then raised for the first time in his motion for new trial the argument, again presented here, that the trial court should have sua sponte granted a mistrial.

> We disagree. As this Court has stated earlier,
>
> The entry of a mistrial is appropriate when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur.
>
> Whether an occurrence during the course of a trial warrants the entry of a mistrial is a matter which addresses itself to the sound discretion of the trial court; and this Court will not interfere with the exercise of this discretion absent clear abuse appearing on the face of the record.

State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). In McPherson, the defendant was on trial for aggravated rape. In recounting the crime on the witness stand, the victim became upset. The court called a recess, but before the jury had left the room, the victim-witness coordinator for the district attorney's office came into the courtroom and began hugging the victim. The defendant requested a mistrial, which the trial court denied on the grounds that it was " 'satisfied beyond a reasonable doubt that it did not change the outcome of [the] trial.' " Id. This Court affirmed the trial court's decision, finding no abuse of discretion. Similarly, in State v. Adkins, the minor victim became upset and cried while on the witness stand in an aggravated sexual battery case. The jury was not sent out of the courtroom until two to four minutes had passed. On appeal, the defendant contended that he was entitled to a mistrial and new trial on this basis. Our Supreme Court held, "We do not believe the behavior of the witness was so prejudicial that the defendant could not receive a fair trial. . . . The granting of a mistrial is within the discretion of the trial court. A reviewing court will not disturb that action absent a finding of abuse of that discretion." 786 S.W.2d 642, 644 (Tenn. 1990).

22

In the instant case, although no motion for mistrial was made, it is clear from the court's remarks in response to defense counsel's objection that it had determined the defendant suffered no prejudice from the victims' mothers' conduct. Defense counsel declined to request a curative instruction and appeared satisfied with the trial court's response to his objection. No abuse of discretion has been demonstrated in the trial court's refusal to declare a mistrial <u>sua</u> <u>sponte</u>. This issue is without merit.

## VI. ADMISSION OF PHOTOGRAPH

In his next issue, the defendant contends that the trial court erred by admitting into evidence a photograph of the driver's seat in which Dawson had been sitting. The photograph depicts bloodstains on the seat as well as a small amount of unidentified material which the defendant describes as "what could be considered guts." He argues that the photograph was not probative of any issue and that it was prejudicial and served merely to "inflame the jury." The State responds that the photograph was offered in order to prove that Dawson "did not have a weapon in the front seat, and to show the force from the close range shots that threw [him] over to the armrest, where he bled considerably." At trial and upon the defendant's objection to the introduction of this photograph, the trial court found,

> There is some smearing of blood. I don't believe -- well, in the court's opinion, looking at that, it's not unduly prejudicial. It doesn't elicit any particular revulsion in light of what's commonly on television for adult viewing these days. . . . It's not particularly bloody. Now, I don't think any adults or any ordinary jury is going to get particularly revolted or so distressed by looking at some moderate to small amount of dried blood on a front seat.

Under our rules of evidence, the test for determining whether evidence is "relevant" is easy to pass: "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Tenn. R. Evid. 401. As the State points out in its brief, the defendant had been charged with premeditated first-degree murder. In order to prove this offense, the State had to prove that the defendant

23

killed Dawson intentionally, deliberately and with premeditation.  See T.C.A. § 39-13-202(a)(1) (1989 Supp).  The amount of blood depicted in the photograph, together with the implied position of the victim's body, satisfies the definition of relevant evidence insofar as tending to prove that the defendant shot Dawson intentionally and/or deliberately.  That is, the photograph was probative as to the effect of the gunshots upon Dawson's body and, therefore, as to the issue of whether the defendant shot him accidentally or intentionally and/or deliberately.  The photograph was also probative as to the State's theory of how the victim was killed.  Therefore, we disagree with the defendant that the photograph was not relevant.

While relevant, a photograph may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice."  Tenn. R. Evid. 403.  However, this balancing test is committed to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent a showing of clear abuse of discretion.  State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994).  No such showing has been made here.  This issue is accordingly without merit.[6]

## VII.  TRIAL COURT'S RESPONSE TO JUROR QUESTIONS

In his next issue, the defendant asserts that the trial court erred in its response to the jury when the jury asked certain questions during its deliberations in the penalty phase of the trial.  Those questions propounded by the jury to the trial court were as follows:

(1)     How many years for life?

(2)     What does ɥife sentence' mean?

(3)     Can we ask for life without parole?  Can we stipulate life plus so many years?

(4)     Can we ask for consecutive life sentences?

---

[6]Even if the photograph were not relevant, we deem its admission to have been harmless error in light of the other evidence against the defendant.

24

(5)     What does it mean if you're sentenced to death and life?

In response to these questions, the trial court stated, "All right. You're directed to refer to the charges and instructions that are contained in the jacket. Thank you. You may retire to continue your deliberations." The defendant contends that the questions posed indicated that the jury was considering improper matters, and that the trial court "should have directed the jury that the questions posed were not proper considerations in the determination of the sentence." The defendant concedes that there is no authority for the requirement that the trial court give this direction prior to referring the jury to the charge and instructions given initially. The State responds, first, that this issue is waived because the defendant did not object to the trial court's response to the jury's questions at the time it was given, and second, that the trial court's response was proper and that this issue is therefore without merit even if we should consider it.

We agree with the State on both counts. As a general rule, "[a] party cannot witness misconduct on the part of the court, await the result of the verdict, and then, if it is against him or her, object to the alleged misconduct." State v. Tune, 872 S.W.2d 922, 930 (Tenn. Crim. App. 1993). The trial court in this case took the questions from the jury after recalling counsel, the defendant, the court reporter and the jury back into open court in order to take the matter up on the record. Thus, defense counsel had every opportunity to object at the time the trial court gave its response. Defense counsel chose not to do so. The defendant will not now be heard to complain. See T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

Even if the defendant had not waived this "error," however, this issue has no merit. As the defendant acknowledges, the trial court followed the proper method of fielding the jury's questions. See State v. Mays, 677 S.W.2d 476, 479 (Tenn. Crim. App.

1984) ("The proper method of fielding questions propounded by the jury during deliberations is to recall the jury, counsel, the defendant(s), and the court reporter back into open court and to take the matter up on the record.") Additionally, contrary to the defendant's contention, the trial court responded properly to the jury's inquiry. See, e.g., State v. Johnson, 698 S.W.2d 631 (Tenn. 1985). In Johnson, a capital case, our Supreme Court addressed a situation in which one of the jurors had asked questions regarding parole during voir dire. The Court stated, "the preferable response to a juror's inquiry about parole is to instruct the jury to limit their deliberations to the instructions given them at the close of the evidence." Id. at 633. That is exactly what the trial court did in this case. In State v. Smith, 857 S.W.2d 1 (Tenn. 1993), another capital case, our Supreme Court again addressed the proper response to jury inquiries about sentencing and parole. The trial court had refused to supplement its original instructions. The defendant argued that information about parole eligibility might operate as mitigating evidence and the trial court's refusal to give additional instructions "somehow create[d] a non-statutory aggravating factor of future dangerousness." 857 S.W.2d at 11. The Court rejected this argument, opining "that to provide a jury with the sort of information requested by defendant could result in sentences of death based on sheer speculation and on factors other than those enumerated in T.C.A. § 39-2-203 and sanctioned under either [the Tennessee or United States] Constitution." Id. The trial court did not err in its response to the jury's questions in this case, and this issue is therefore without merit.

## VIII. SUFFICIENCY OF AGGRAVATOR EVIDENCE

The jury sentenced the defendant to death for the felony murder of Damond Dawson, finding as an aggravating circumstance that he had knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder. See T.C.A. § 39-13-204(i)(3) (1991 Repl). The defendant contends that the evidence was insufficient to support this aggravating circumstance, alleging that "no facts were introduced during the trial to prove that [he] knowingly created a risk of death to two

26

or more persons." However, the proof at trial established that the defendant shot Damond Dawson repeatedly, from close range, while Dawson sat in a stationary car with two other people. The risk to these two other people is more than obvious.[7] The defendant's contention that he did not "knowingly" create this risk is ludicrous. A person acts "knowingly" with respect to his conduct when he is aware of the nature of his conduct. T.C.A. § 39-11-302(b)(1991 Repl). The proof at trial established that the defendant pointed a loaded pistol into a car in which three people sat, fired the pistol into the car several times, walked away and then walked back and shot some more.[8] Clearly, the defendant was "aware" of the "nature of his conduct." This issue is wholly without merit.[9]

The defendant also argues that the State improperly relied on the attempted felony murder convictions during its closing argument during the penalty phase of the trial. Specifically, he contends that, "In support of this aggravating circumstance, the State argued that the two (2) companion convictions for criminal attempt felony murder established this aggravating circumstance." The defendant then cites a portion of the prosecutor's closing argument referencing the attempted murder verdicts. However, the record reveals the entirety of the prosecutor's argument in support of this aggravating

---

[7]The defendant was also convicted of the felony murder of one of these two other people ("the Johnson felony murder"). However, because there is no duplication between the elements of felony murder and the aggravator for putting two or more other people at great risk of death during the murder, the Johnson felony murder conviction does not create a bar to using the facts on which it is based to prove an aggravating circumstance in support of the death penalty for the Dawson felony murder. That is, no Middlebrooks-type error is thereby committed. Cf. State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992) (when defendant is convicted of felony murder, the felony murder aggravator, T.C.A. § 39-13-204(i)(7), may not be used as an aggravating circumstance in support of the death penalty because, due to the broad definition of felony murder and the duplicating language of the felony murder aggravating circumstance, there is no narrowing of the class of death-eligible defendants as required by the federal and Tennessee constitutions). Nor is a double jeopardy problem thereby created: in using the same facts (together with the presence of the third occupant in the car) to establish both the Johnson felony murder conviction and the aggravating circumstance for the Dawson felony murder, the defendant is not being punished twice for the same crime.

[8]The defendant's own statement also indicates that he shot at Blackman while Eric Jones and two other boys were in the line of fire. However, because we deem the aggravator to have been sufficiently proven by the defendant's shots into the car, we decline to address the issue of whether this prior conduct by the defendant occurred "during the act of murder" as required by the aggravator.

[9]We also note that the other assailants surrounding the car were put at great risk from the defendant's bullets.

factor on initial closing argument as follows:

> In this particular case, the state has alleged that there are two aggravating factors, and I'm going to talk about them briefly. Both of them have been proven, I submit, by proof that is put on during the guilt phase of the trial; and the judge will instruct you that you may use what proof has been put on in the trial to consider at this phase of the trial -- in sentencing -- both as to aggravating factors and as to any mitigating factors also.
>
> . . . .
>
> Now, the two aggravating factors that we intend to go into -- or that the state submits ha[ve] been proven to you is, first of all, that the defendant caused risk of great bodily harm to two or more other persons other than the intended victims of this crime.
>
> Now, what we're talking about is when Mr. Blackman was running from the car, Eric Jones was in the way of the shooting. Eric Jones confronted Tommie Blackman as he ran from the car and was caught in this gunfire. Now, fortunately he wasn't hit.
>
> But also there were three other young men playing basketball on the side of the yard. All three of those young men were also caught in the gunfire of the individual shooting at Tommie Blackman. That is risk of death or great bodily injury to persons other than the intended victims in this case.
>
> Now, we've proven there were four persons -- in addition to Tommie Blackman, there were four persons[10] that were in the line of fire. That is one of the aggravating factors in this case, ladies and gentlemen.

And then on final closing argument:

> [As to the] risk of death to two or more people. How about -- how about Eric Thomas who caught three rounds in his body fired not by one of [the defendant's] co-defendants but by that man right there. He shot him and shot him and shot him. That's a pretty good risk of death. How about Tommie Blackman who's running? There's a risk of death to two people right there, not even counting the children playing basketball. We haven't proven a risk of death to two or more people? My God, you've returned a verdict that he attempted to murder two other people. It is established, beyond a reasonable doubt, and already been found as a verdict that there was a risk of death to two or more people.

It is this very latter portion of the prosecutor's closing argument about which the

defendant now complains.

---

[10]In fact, Eric Jones testified that he had been playing basketball with two other boys, not three. Thus, in addition to Blackman, there were three other persons in the line of fire, not four as argued by the State. This error in reciting the facts during argument was harmless.

28

We first note that the defendant raised no objection to the prosecution's argument at trial. Accordingly, any argument of prosecutorial misconduct has been waived. State v. Killebrew, 760 S.W.2d 228, 231 n.11 (Tenn. Crim. App. 1988); T.R.A.P. 36(a). Even if the defendant's objection had not been waived, however, the prosecutor's argument, when taken in its entirety, was not improper. The prosecutor told the jury, correctly, that it could rely on evidence which had been admitted during the guilt phase of the trial. He then went on to argue a couple of different ways in which he thought the proof supported the aggravating factor. He did not emphasize one over the other. He did not tell the jury that its verdicts of attempted felony murder meant that the aggravating factor had already been established or that it did not have to follow the trial court's instructions about its duty to determine the existence of one or more aggravating factors. And the court did not instruct the jury that its attempted murder verdicts constituted or were the equivalent of a finding of the aggravating factor.

Moreover, the jury did not have to accept the prosecutor's interpretations of the evidence: it was free to interpret the evidence in any way it chose within the context of the court's instructions on the aggravating factor. Indeed, the State did not make the easiest argument in support of this factor: that by repeatedly firing a pistol into a car in which three people sit, the shooter clearly creates a risk of death to every occupant of the car and possibly those outside in the immediate area. This argument is without merit.

## IX. PROPRIETY OF DEATH SENTENCE

The defendant next contends that "his role was minor in this case, and as such, requires reversal of the death sentence." We first note that the death penalty in this case was imposed for the defendant's felony murder of Damond Dawson. We also note, as set forth above, that the evidence was sufficient to support the jury's verdict that the defendant murdered Dawson in the perpetration of a robbery. The defendant's role in this crime, as determined by the jury, was hardly "minor."

29

The defendant argues that, since he was under the impression he was joining the other assailants to participate in a fight, and that he had no knowledge of the robbery or intent to commit it, the sentence imposed is disproportionate to his culpability, relying on Enmund v. Florida, 458 U.S. 782 (1982), and State v. Branam, 855 S.W.2d 563 (Tenn. 1993). In Branam, our Supreme Court outlined the controlling law addressing the defendant's claim, construing Enmund in the process:

> In Enmund v. Florida, . . . the United States Supreme Court held that death is a disproportionate penalty and, therefore, constitutes cruel and unusual punishment under the Eighth Amendment, where it is imposed against a defendant 'solely for participation in a robbery in which another robber takes life,' without proof that the defendant himself attempted or intended to kill, or intended that lethal force be used. This constitutional standard was refined by the Court in Tison v. Arizona . . . in which it was held that the Eighth Amendment does not prohibit the death penalty in the case of a defendant whose participation in a felony that results in murder is major and whose mental state at the time is one of reckless indifference to the value of human life -- even though the proof fails to show intent to kill.

855 S.W.2d at 570.

The defendant's argument on this issue assumes that the evidence was insufficient to prove that he is guilty of felony murder. As is seen above, however, the evidence does sufficiently prove his guilt. Even if the defendant did not actually shoot Dawson, as the evidence indicates, the defendant's own statement that he shot several times at Blackman demonstrated that he "attempted or intended to kill, or intended that lethal force be used." At the very least, this represents a "reckless indifference to the value of human life." This issue is therefore without merit.

We deem it appropriate to consider within the context of this issue the propriety of the defendant's death sentence in light of the determinations which our legislature requires this Court to make in every direct appeal of death penalty cases. That is, we must determine whether the defendant's sentence of death was imposed in any arbitrary fashion; whether the evidence supports the jury's finding of the aggravating

30

circumstance; whether the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances; and whether the defendant's death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. T.C.A. § 39-13-206(c)(1) (1996 Supp).

As set forth above, we have determined that the evidence supports the jury's finding of the aggravating circumstance that the defendant knowingly created a great risk of death to two or more persons, other than Dawson, during his murder of Dawson. The evidence also supports the jury's finding that this aggravating circumstance outweighed the mitigating circumstances offered during the penalty phase of the trial.[11] We further find, based upon our review of the entire record of this cause, that the sentence of death was not imposed in any arbitrary fashion. Finally, we have determined that the death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the nature of this felony murder and the defendant.[12]

## X. VICTIM IMPACT EVIDENCE

In his penultimate issue, the defendant claims that the testimony of the victims' mothers during the penalty phase of the trial about the impact of the victims' deaths was irrelevant to any sentencing determination, highly inflammatory and admitted in violation of Tennessee's death penalty statutes; Tennessee's Rule of Evidence 403; Article 1, §§ 8 and 16 of the Tennessee Constitution; and the Eighth and Fourteenth Amendments to the United States Constitution, and that his death sentence ought

---

[11]The mitigation proof consisted of the defendant's parents' testimony that he was a "good son" and that they loved him; his brother's testimony that the defendant had been a good employee and that he had never known the defendant to be violent; testimony that the defendant had attended church services regularly; and that he had been well behaved in jail.

[12]The statutorily required determination that the death penalty was not imposed in an arbitrary fashion was made without the benefit of the "Report of Trial Judge in Capital Cases" as required by our Supreme Court in its Rule 12. The absence of this report does not prevent us from conducting the required review. See State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994).

therefore be set aside. We disagree.

> Under our death penalty statutes, during the sentencing proceeding evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated [herein]; and any evidence tending to establish or rebut any mitigating factors. <u>Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence;</u> provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or of the state of Tennessee.

T.C.A. § 39-13-204(c) (emphasis added). Given the plain language of this statute, the defendant's argument that victim impact evidence is inadmissible under Tennessee Rule of Evidence 403 is misplaced. If the evidence is properly admissible under this statute, its inadmissibility under our rules of evidence is inapposite. If it is not properly admissible under this statute, then its inadmissibility under 403 is simply redundant. <u>See also</u> <u>State v. Odom</u>, 928 S.W.2d 18, 28 (Tenn. 1996) ("This statute expressly exempts evidence adduced in capital sentencing proceedings from the usual evidentiary rules.")

In 1979, our Supreme Court construed identical language in the then-current capital sentencing provisions of our Code in <u>Cozzolino v. State</u>, 584 S.W.2d 765 (Tenn. 1979). It held:

> On its face section (c) would seem to permit the introduction of evidence 'relevant to the punishment' in addition to that 'tending to establish or rebut the aggravating circumstances' or 'tending to establish or rebut any mitigating factors.' However, this interpretation is one that we cannot accept. When the statute is considered as a whole, it is clear that <u>the only issues that the jury may properly consider in reaching a decision on the sentence to be imposed are whether the State has established one or more of the aggravating circumstances beyond a reasonable doubt and, if so, whether any mitigating factors have been shown that would outweigh those aggravating circumstances.</u> Any evidence that does not go to the proof of one or the other of those issues is irrelevant to the jury's deliberation. We cannot believe that the legislature intended that irrelevant evidence be placed before the jury, fraught as such a procedure would be with the 'substantial risk that [the death penalty]

> would be inflicted in an arbitrary or capricious manner,' <u>Gregg v. Georgia</u>, 428 U.S. 153, 188, 96 Sup. Ct. 2909, 2932, 49 L.Ed.2d 859 (1979), i.e., on the basis of factors other than those deemed by the legislature to be proper predicates for the sentencing determination. We think that a better interpretation of TCA § 39-2404(c), and one more in keeping with both the sense of the entire statute and the mandate of the United States Supreme Court, <u>see, e.g.,</u> <u>Gregg v. Georgia</u>, <u>supra</u>; <u>Lockett v. Ohio</u>, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), is that <u>evidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant.</u>

<u>Cozzolino</u>, 584 S.W.2d at 767-68 (emphasis added).  We note, however, that the evidence challenged as irrelevant in <u>Cozzolino</u> was proof that the defendant had committed subsequent crimes.  Victim impact evidence was not at issue.

Our Supreme Court has neither overruled nor modified its decision in <u>Cozzolino</u>.  It has, however, since indicated that, even where "technically irrelevant," victim impact considerations may be relevant to a defendant's "personal responsibility and moral guilt." <u>State v. Payne</u>, 791 S.W.2d 10, 18 and 19 (Tenn. 1990), <u>aff'd</u> 501 U.S. 808 (1991).  In <u>Payne</u>, the Court considered the brutal stabbing murders of a young mother and her daughter and the simultaneous stabbing of the woman's young son.  Admitted into evidence was the grandmother's testimony that the young son "cries for his mom.  He doesn't seem to understand why she doesn't come home.  And he cries for his sister Lacie.  He come to me many times during the week and asks me, Grandmama, do you miss my Lacie.  And I tell yes.  He says, I'm worried bout my Lacie."  On appeal, the Court was not faced with the argument that this statement was not properly admissible under Tennessee's death penalty statute, but rather the defendant argued that the testimony violated his constitutional rights under <u>Booth v. Maryland</u>, 482 U.S. 496 (1987).  The Court held that, "[w]hile technically irrelevant, that statement did not create a constitutionally unacceptable risk of an arbitrary imposition of the death penalty, and was harmless beyond a reasonable doubt." <u>Payne</u>, 791 S.W.2d at 18.  The Court made no reference to either <u>Cozzolino</u> or the statutory language construed therein.

33

Also at issue in Payne was the prosecutor's use of victim impact concerns in his argument to the jury. In response to the defendant's assertion that the State's closing argument violated his Eighth Amendment rights, our Supreme Court stated:

> We are of the opinion that the prosecutor's argument is relevant to this defendant's personal responsibility and moral guilt. When a person deliberately picks a butcher knife out of a kitchen drawer and proceeds to stab to death a twenty-eight year old mother, her two and one-half year old daughter and her three and one-half year old son, in the same room, the physical and mental condition of the boy he left for dead is surely relevant in determining his ‹blameworthiness.'
>
> It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.
>
> . . . .
>
> [W]e are of the opinion that assuming the argument here violated the Eighth Amendment, as interpreted by the United States Supreme Court, we think it subject to harmless error analysis. . . [and] the State's argument was harmless beyond a reasonable doubt.

Payne, 791 S.W.2d at 19.

On appeal, the United States Supreme Court affirmed our Supreme Court's holding in Payne, thereby overruling its earlier Booth decision. Specifically, the United States Supreme Court held in Payne that,

> if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

Payne v. Tennessee, 501 U.S. 808, 827 (1991).

It is difficult to reconcile our Supreme Court's decisions in Cozzolino and Payne. While the Payne Court was not presented with the issue of the admissibility of

34

the victim impact evidence under the death penalty statute, it certainly had the power to comment upon the issue had it chosen to do so. See T.R.A.P. 13(b). See also State v. Bigbee, 885 S.W.2d 797, 808 (Tenn. 1994) (victim impact evidence challenged on constitutional grounds found harmless; no reference to the death penalty statute or Cozzolino). Moreover, when again presented with the issue of prosecutorial argument focusing on victim impact in State v. Shepherd, our Supreme Court held "Such victim-impact argument is not improper," citing Payne: although it went on to caution the State "to utilize such arguments advisedly." 902 S.W.2d 895, 907-08 (Tenn. 1995). It appears, then, that the Court is not anxious to find victim impact evidence inadmissible; and, even when it is "technically" so, the Court appears prone to find its admission harmless.

In the present case, the State called the mothers of the two murdered victims to testify during the sentencing phase of the trial. Dawson's mother testified that the shootings had had a negative effect on the neighborhood, making her neighbors "scared to look out the door;" that she had had to buy another house because she couldn't continue to live in the one in which her son had lived; that everything had changed and her life would never be the same; that she is now divorced; and that she "sure would like to know what it feels like to feel happy again -- just to feel happy." Johnson's mother testified that, since her son's death, "It's been hard to let go. I know I can't see Tracey anymore. A day don't pass I don't shed a tear." She also testified about the effects of her son's death on her other children, her father and Tracey's young daughter.

In light of Cozzolino, we find ourselves constrained to hold that this evidence was "technically irrelevant." However, following our Supreme Court's lead in Payne, we also find that its admission did not create a constitutionally unacceptable risk of an arbitrary imposition of the death penalty and was harmless beyond a reasonable doubt. The jury found as the sole aggravator that the defendant had knowingly created

35

a great risk of death to two or more persons other than the murder victim during the act of murder. There was more than sufficient proof on this point to support the jury's finding. Moreover, the trial judge correctly instructed the jury as to the aggravating factors at issue, telling them that he had

> read to you the aggravating circumstances which the law requires you to consider if you find, beyond a reasonable doubt, that the evidence was established. <u>You should not take into account any other facts or circumstances as the basis for deciding whether the death penalty would be appropriate punishment in this case, except as such fact[s] and circumstances may establish mitigating circumstances or factors</u>.

(emphasis added). Thus, the jury was instructed to not consider the victim impact evidence in deciding whether to impose the death penalty. A jury is presumed to follow its instructions. <u>See, e.g.</u>, <u>State v. Blackmon</u>, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985).

With respect to the defendant's arguments that the admission of the evidence was unconstitutional, the discussion above demonstrates that there is no <u>per se</u> Eighth Amendment bar to the admissibility of victim impact evidence. And because we find the admission of the evidence in this case to have been harmless error, we also find that the evidence did not render the defendant's trial fundamentally unfair in violation of his due process rights under the Fourteenth Amendment. <u>Cf</u>. <u>Payne v. Tennessee</u>, 501 U.S. 808, 831 (1991). (If such victim impact evidence so infects the sentencing hearing as to render it fundamentally unfair, the defendant may take appropriate relief under the due process clause.) (O'Connor, J., concurring). Finally, the defendant has cited us to no authority holding that Article I, Sections 8 and 16 of the Tennessee Constitution afford him any greater protection. Accordingly, this issue is without merit.

## XI. CONSTITUTIONALITY OF DEATH PENALTY

In his last contention, the defendant maintains that Tennessee's death penalty statutes are unconstitutional. He acknowledges that his challenges have been

36

rejected by our Supreme Court, but reserves the issues for later review. This Court is, of course, bound by our Supreme Court's prior holdings that Tennessee's death penalty statutes are constitutional. Accordingly, we hold without further discussion these issues to be meritless. See, e.g., State v. Smith, 893 S.W.2d 908 (Tenn. 1994), cert. denied, __ U.S. __ (1995); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994), cert. denied, __ U.S. __ (1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), cert. denied, __ U.S. __ (1995); State v. Smith, 857 S.W.2d 1 (Tenn. 1993), cert. denied, 510 U.S. 996 (1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990), cert. denied, 498 U.S. 1074 (1991); State v. Teel, 793 S.W.2d 236 (Tenn. 1990), cert. denied, 498 U.S. 1007 (1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989), cert. denied, 497 U.S. 1031 (1990).

The defendant's convictions for attempted felony murder are reversed and dismissed and this cause is remanded for further proceedings on the two counts of attempted premeditated murder. The judgment below is otherwise affirmed.

_____
JOHN H. PEAY, Judge

CONCUR:


_____
JOE B. JONES, Judge


_____
JOE G. RILEY, Judge